PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States

MATTHEW M. YELOVICH (NYBN 4897013)
Acting Chief, Criminal Division

DAVID J. WARD (CABN 239504)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7230
    david.ward@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> NICK BOVIS, <br><br> Defendant. | NO. CR 21-00204 WHO <br><br> UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K1.1 <br><br> Sentencing Date: March 7, 2024 <br> Time: 1:30 p.m. <br> Judge: Hon. William H. Orrick |

## I. INTRODUCTION

Defendant Nick Bovis comes before this Court for sentencing after pleading guilty to participating in a four-year honest services fraud scheme in which he showered tens of thousands of dollars in bribes - from cash to meals to home furnishings - to Mohammed Nuru, the then director of the San Francisco Department of Public Works ("DPW"). Defendant Bovis' bribes were made to feed Nuru's corruption, and were done to influence Nuru to use his position as a high-ranking San Francisco public official to direct city contracts and other benefits to Bovis and his business ventures. Separately, Bovis has pled guilty to one count of insurance wire fraud, admitting to a fraudulent scheme to obtain $85,000 in insurance benefits after a fire severely damaged one of his restaurants.

In mitigation, within weeks of being charged, Bovis began cooperating with the government. Within months, he had pled guilty, and he cooperated with the government for almost three years. Given all this, the government recommends that the Court grant the government's motion for a downward departure under § 5K1.1 of the U.S. Sentencing Guidelines, then further vary downward from the recommended Guidelines range and impose a sentence of nine months in custody, a $100,000 fine, and one year of supervised release.

**II.     BACKGROUND**

The facts of Nick Bovis' crimes are detailed in the Criminal Complaint (*Dkt. 1*), Plea Agreement *(Dkt. 41)*, and the Presentence Report, all filed in this case, as well as the plea agreements filed in *United States v. Paul Giusti*, 21-CR-00294 WHO and *United States v. Mohammed Nuru*, 21-CR-0490 WHO. The broader facts surrounding Mohammed Nuru's corruption are well known to this Court.

      *a.     The Mohammed Nuru Bribery Scheme*

Like almost a dozen other defendants who have come before this Court for sentencing, defendant Nick Bovis ensnared himself in the web of corruption woven by Mohammed Nuru.

At the time of the conspiracy, Nuru was the director of the San Francisco Department of Public Works, and served as the chair of the Transbay Joint Powers Authority Board (TJPA). As the director of the Department of Public Works, Nuru managed a sprawling city agency with an annual budget of over $380 million. As Chair of the TJPA, he had enormous sway over a separate public agency with a $169 million budget.[1] Overall, Nuru wielded immense power and influence in San Francisco politics and government. And Nuru's influence was for sale, and defendant Bovis was an eager buyer.

Beginning in 2015, Bovis admits that he began lavishing bribes on Nuru. He provided Nuru and Nuru's friends and family members with free meals and drinks at various restaurants Bovis owned in the San Francisco Bay Area. *PSR.*¶ 9. He purchased over $22,000 in high-end kitchen appliances that he had delivered and installed at the vacation home in Lodoga, California that Nuru was building and furnishing (much of it paid for with the graft from Nuru's wider bribery schemes). *PSR* ¶ 11. In

---

[1] The San Francisco Public Utilities Commission annual budget for FY 2019 was $386,726,519, *See* https://sfpublicworks.org/about/budget. The Transbay Joint Powers Authority Board's capital budget was $169,832,720. *https://www.tjpa.org/files/2019/09/Item10_FY19-Capital-Budget-Amendment.pdf*

U.S. SENTENCING MEMORANDUM    2
CR 20-00192 WHO

addition, Bovis paid for a marketing project for Nuru's girlfriend, and paid for designed services provided in connection with the design and construction of Nuru's Lodoga vacation home. *Dkt. 41* (Plea Agreement) ¶ 7.

The bribes went on for years, and none of it was charitable giving. Bovis admits that this stream of corrupt benefits had a single purpose - influencing Nuru to use his official positions as head of the Department of Public Works, or to use his broader influence in San Francisco city government, to direct city business and city contracts to Bovis and his companies. Bovis explicitly admits as much in his plea agreement: "[t]he primary purpose of my scheme with Nuru was to exercise and preserve Nuru's power and influence within the City government, for the financial benefit of ourselves, our family members, and our associates." *Id.* ¶ 4. Among the benefits Bovis sought from Nuru were contracts to supply the city with portable public toilets (part of the City of San Francisco's Pit Stop program). *Id.* Bovis sought separate contracts to furnish container-type portable housing units for use by the homeless, and for a contract or subcontract work to help build a new "Navigation Center" for the homeless along the Embarcadero *Id.* ¶ 18. Hoping to obtain this business, Bovis paid bribes to Nuru, time and time again.

In 2018, Bovis turned his eye towards an even bigger prize, a lease to operate one of his restaurants in inside the San Francisco International Airport. *PSR* ¶ 10. This was a highly lucrative business opportunity. Bovis admits that he expected that, if the lease came to fruition, it would generate over $3 million in gross receipts over the 10-year life of the contract. *Id.*

By law and practice, a competitive bidding process was required for obtaining this airport concession lease. *Dkt. 41* (Plea Agreement) ¶ 9. But as was their practice, Nuru and Bovis had other plans. Instead of honestly competing, Bovis and Nuru conspired to bribe a member of the San Francisco Airport Commission to help persuade her to award the lease to Bovis. At the time this aspect of Bovis scheming with Nuru was coming to fruition, the FBI was aware of the activity, and had undercover agents meet with Bovis. In a recorded conversation, Bovis described how Nuru instructed him to to give the airport commissioner $5,000, and arrange for a free vacation trip for her: "*so he [Nuru] told me, he goes, just give me, between me and you, I didn't want to say it in front of the other people . . . if you give me like $5,000 bucks cash and send her off to meet you guys. . . I'll get it taken care of.*" . *Id.* ¶ 10.

To consummate the bribe, Nuru and Bovis planned a private dinner with the commissioner. Prior to the dinner, Bovis again met with an undercover FBI agent, and in this meeting, Bovis admitted that he would provide a kickback to Nuru of some of the profits he expected to earn from winning the airport restaurant lease. *Dkt. 41* (Plea Agreement) ¶ 10. The undercover agent asked Bovis about the potential kickback, saying "*is that already arranged between you, and is that through Mohammed?*" *Id.* Bovis responded "*yeah, yeah . . . that way everybody is separated you know.*" *Id.*

In the end, the plan to bribe the airport commissioner never came to fruition because Bovis became suspicious of the undercover agent.

        b.      *The Lefty O'Doul's Foundation Scheme*

In yet another iteration of his corrupt partnership with Nuru, Bovis allowed a non-profit he ran, the Lefty O'Doul's Foundation for Kids, to be used by Nuru and corrupt executives from waste management company Recology Inc., to conceal $60,000 in bribe payments that Recology executives made to Nuru to fund elaborate holiday parties for Nuru's friends and political supporters. *See United States v. Giusti*, 21-CR-00294 WHO, *Dkt. 40* (Plea Agreement). This scheme continued for four years, from 2016 to 2019. *Id.* To conceal the Recology bribes, Bovis agreed that Recology executive Paul Giusti could direct Recology payments to Bovis' non-profit, which they falsely labeled as "holiday donations" and claimed were charitable gifts that would go to providing baseball equipment and tickets to baseball games for under-privileged children. *Id.* But that was merely the subterfuge. In fact, the funds went from Bovis' non-profit directly to Nuru to fund his opulent annual holiday parties. *Id.* In return for his agreement to allow Nuru and Recology to use his non-profit to conceal their corruption, Bovis was hired and paid to help plan, supply, and cater the parties, each one for hundreds of guests.

        c.      *The Broadway Grille Restaurant Insurance Fraud Scheme*

Separate from his bribery scheme, Bovis was independently engaged in insurance fraud. On April 25, 2018, a fire severely damaged the Broadway Grille, one of Bovis' restaurants. *Dkt. 41* (Plea Agreement) ¶ 20. Bovis was forced to close the restaurant for months to rebuild and repair the damage. *Id.* Bovis filed multiple insurance claims, and they were fraudulent. *Id.* Bovis admits that when he submitted his insurance claims, he knowingly and falsely inflated the property damage figures, as well as the cost from the interruption of the business. *Id.* Bovis admits that he submitted false claims for

reimbursement for payroll expenses, even though he was no longer paying those employees. *Id.* In total, Bovis admitted to fraudulently obtaining over $85,000 in insurance benefits. *Id.* For this, Bovis has pled guilty to one count of insurance wire fraud.

### III. GUIDELINES CALCULATION ANALYSIS

The government agrees with U.S. Probation's calculation of the U.S. Sentencing Guidelines, which are as follows:

<u>Count One</u>: Honest Services Wire Fraud

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. §2C1.1(a)(2): | 12 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2: | |
| | The offense involved multiple bribes. U.S.S.G. § 2C1.1(b)(1) | +2 |
| | The value of the payments or benefits received exceeded $6,500; U.S.S.G §2C1.1(b)(2); U.S.S.G. §2B1.1(b)(1)(C): | +4 |
| | The offense involved a public official in a high-level or sensitive decision-making position. U.S.S.G. § 2C1.1(b)(3): | +4 |
| c. | Adjusted Offense Level: | 22 |

<u>Count Two</u>: Insurance Wire Fraud

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. §2B1.1(a)(1): | 7 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2: | |
| | The value of the loss was between $40,000 and $95,000; U.S.S.G. §2B1.1(b)(1)(D): | +6 |
| c. | Adjusted Offense Level: | 13 |
| d. | Greater of the Adjusted Offense Levels: | 22 |
| e. | Acceptance of Responsibility, U.S.S.G. § 3E1.1(a), (b): | - 3 |
| f. | Zero-Point Offender USSG Reduction. U.S.S.G. § 4C1.1(a)(2) - (a)10 | - 2 |
| g. | Total Offense Level | 17 |

//
//
//

CR 20-00192 WHO

## IV. SENTENCING RECOMMENDATION

### A. Legal Standard

The U.S. Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process, and are to be a guide and reference point for the Court throughout the sentencing process. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to impose a sentence that is "sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991. In accomplishing that goal, the Court should consider the following factors set out in 18 U.S.C. § 3553(a):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a) Sentencing Factors

#### 1. *The Facts and Circumstances and the Need For the Sentence to Reflect the Seriousness of the Offense and to Provide Just Punishment for the Offense*

This case arises out of a sprawling five-year federal investigation into public corruption in San Francisco that has exposed a deep current of greed and self-dealing that infected San Francisco politics and government for years.[2] It has resulted in guilty pleas or criminal convictions for a dozen individuals

---

[2] *See United States v. Mohammed Nuru*, 21-CR-0490 WHO; *United States v. Walter Wong*, 20-CR-0257 WHO; *United States v. Harlan Kelly*, 21-CR-0402 RS; *United States v. Nick Bovis*, 20-CR-0204 WHO; *United States v. Balmore Hernandez*, 20-CR-0353 WHO; *United States v. William Gilmartin*, 20-C4-0353 WHO; United *States v. Alan Varela*, 21-CR-0192 WHO; *United States v. Florence Kong*, 20-CR-0354 WHO; *United States v. Sandra Zuniga*, 21-CR-0096 WHO. *United States v. Recology Inc.* 21-CR-0356 WHO, *United States v. Paul Giusti*, 21-CR-0294 WHO; *United States v. John Porter*, 22-CR-0270 WHO; *United States v. Zhang Li*, 23-CR-0220 WHO; *United States v. Z&L Properties*, 23-CR-0221 WHO; *United States v. Ken Wong*, 23-CR-0162 WHO

and two companies.³  It is one of the worst public corruption scandals in San Francisco's history, and defendant Bovis' actions, his corrupt partnership with Nuru and others, were at the heart of it.

As Courts have repeatedly noted, there is no question as to the societal and civic harm wrought by public corruption schemes.  *See e.g, United States v. Brennan* 629 F. Supp. 283, 300 (E.D.N.Y. 1986) ("Bribery is a betrayal of trust.  Trust, the expectation that one will do what one is relied on to do, is a precious necessity of every social enterprise . . . no crime is more corrosive of our institutions.").

As Justice Clarence Thomas explained, bribery is the "perversion or destruction of integrity in the discharge of public duties."  *Nixon v. Shrink Missouri Government*, 120 S. Ct. 897, 923 (J. Thomas, dissent), quoting 3 Oxford English Dictionary 974 (1989).  Chief Justice William Rehnquist echoed this sentiment in *Federal Election Commission v. National Conservative Political Action Comm.*, writing that "corruption is the subversion of the political process.  Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves."  470 U.S. 485, 497 (1985).

Defendant Bovis' corruption fall squarely within this subversion of the public trust. The business that Bovis sought to corruptly ply from Nuru - from contracts to provide public toilets, to a multi-million lease open a restaurant at the airport - were all public contracts or business funded by public taxpayer dollars.  They were required to be awarded through an open and honest process, not through the illicit influence of a corrupt city official and the corrupt business executives who conspired with him.

The citizens of San Francisco expect that their tax dollars will be spent fairly and honestly.  The honest businesses seeking these contracts expect that they will be given the chance to compete fairly. When he conspired to bribe Nuru to win these contracts, defendant Bovis betrayed the public trust, and he violated the law.  For this, government asks the Court to impose its recommended sentence, including a term of custody, as a means, in part, to reflect "the seriousness of the offense, [and] promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a).

   **2.**   ***The History and Characteristics of the Defendant***

Nick Bovis was given every opportunity to live the American dream.  He was raised by parents who, in his own words, provided him with "the best life."  *PSR* ¶ 52.  He was a Boy Scout.  *Id.*  He

---

³ *See:* https://sfstandard.com/2023/12/25/biggest-san-francisco-political-scandals-sex-bribes-murder/; https://www.sfchronicle.com/opinion/openforum/article/sf-city-hall-corruption-18272032.php

earned a Bachelor of Science Degree from California Polytechnic University. *PSR* ¶ 67. He began his career as a landscape engineer, and went on to build a successful and highly profitable business, owning and managing multiple restaurants in the San Francisco Bay Area. *PSR* ¶¶ 67, 69. At the height of his career in 2018 and 2019, he was reporting millions of dollars a year in total income. *PSR* ¶ 70. He is married and has two college-aged children. *Id.* While he has had past struggles, including a felony criminal conviction, Bovis has had great success and has earned and been given many benefits.

But despite all that he was given, despite the success he has earned, and despite a criminal past from which he should have learned from, he nonetheless turned to corruption and fraud. As an educated business owner with years of experience working in San Francisco, Bovis knew what he was doing was wrong. Yet he let his greed overtake any sense of right or wrong, of ethics or morality. Not once, or twice, but continuously in a bribery scheme that stretched out over four years. Even worse, during this same time period he engaged in egregious insurance fraud, submitting over $85,000 in fraudulent insurance expenses.

Given the circumstances of the offenses to which defendant Bovis as admitted, set against his background, education and all of the opportunities he was given, a substantial sentence is warranted in this case. And while the government seeks a substantial sentence, the government also asks the Court to reduce its sentence to reflect Bovis' acceptance of responsibility, his early admission of wrongdoing, and, most significantly, his cooperation with the government's ongoing public corruption investigations and prosecutions over the past three years.

V.     **MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. 5K1.1**

   a.  **The Court Should Grant the Government's 5K1.1 Motion**

"Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. The Court may consider the following when determining the appropriate amount of the reduction; 1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; 2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; 3) the nature and extent of the defendant's assistance; and 4) the timeliness of the

U.S. SENTENCING MEMORANDUM            8
CR 20-00192 WHO

defendant's assistance. U.S.S.G. § 5K1.1.

Within weeks of being arrested and charged, Bovis began cooperating with the government. Over three years, Bovis repeatedly met with government prosecutors and agents and provided information about public corruption in San Francisco. He provided valuable information and evidence against Nuru, as well as against Recology and its now-convicted executives, Paul Giusti and John Porter. Between 2020 and 2022, defendant Bovis met with the government on more than a half-dozen occasions. He also provided documents and communications.

Additionally, Mr. Bovis agreed to testify as a cooperating witness in the then-upcoming trial of Recology executive John Porter. *United States v. John Porter*, 22-CR-0270 WHO. Bovis met with prosecutors and agents for multiple hours in preparation for his testimony. In the end, his testimony was not necessary because Porter pled guilty 25 days before trial. *Id.* Nonetheless, in the government's view, Bovis provided substantial assistance in the Porter prosecution, as well as the broader San Francisco public corruption investigations.

In the government's view, Bovis' cooperation qualifies as substantial assistance justifying the government's motion for a 5K reduction in defendant Bovis' sentence in this case.

**b. The Government's Sentencing Recommendation Avoids Unwarranted Sentencing Disparities**

A downward departure, along with a variance, to a sentence of nine months custody and one year of supervised release, will avoid unwarranted sentencing disparities among the similarly-situated defendants charged as part of the government's San Francisco corruption prosecutions. *See* 18 U.S.C. § 3553(a). Each case and each defendant must be judged independently, and the government acknowledges that the drawing comparisons in an attempt to avoid unwarranted sentencing disparities is challenging. Nonetheless, the government respectfully believes that the Court can and should look to several of the recent public corruption cases that have come before it in determining what sentence is appropriate here.

Broadly, defendant Bovis is similarly situated to the defendants who were business owners and executives who paid bribes in order to win city contracts or other business for themselves or their

companies as opposed to those who acted as agents of a larger company, or were ensnared in a personal relationship that contributed to their criminality.

The cases of Alan Varela, William Gilmartin, and Balmore Hernandez in particular can guide the Court as it looks to avoid unwarranted sentencing disparities here. Like defendant Bovis, defendants Varela, Gilmartin, and Hernandez were all wealthy business executives. Like Bovis, they all also engaged in a years-long scheme of paying bribes to Mohammed Nuru to win contracts for their businesses. All have pled guilty and been sentenced.

Varela was sentenced to 24 months imprisonment, below the recommended U.S. Guidelines of 37 to 46 months (without the benefit of the Zero-Point Offender reduction), and fined $127,000. *United States v. Alen Varela*, 21-CR-0192 WHO, *Dkt 52*. But Varela did not cooperate with the government.

Balmore Hernandez was sentenced to six months imprisonment, one year of supervised release, and fined $100,000. *United States v. Balmore Hernandez*, 20-CR-00353 WHO, *Dkt. 79*. Hernandez, however, cooperated, providing timely and valuable assistance to the government in its investigations. So too did Gilmartin. He pled guilty and cooperated with the government in its investigation and prosecution of Nuru as well as others and was sentenced to a term of eight months in custody, one year of supervised release, and fined $100,000. *United States v. William Gilmartin*, 21-Cr-0192 WHO.

Several other sentences the Court has imposed in these public corruption cases can also provide a helpful benchmark as the Court considers a sentence that will avoid unwarranted sentencing disparities among similarly-situated defendants. Florence Kong was a wealthy business owner who pled guilty to bribing Nuru with a $36,000 Rolex, cash, meals and drinks, all in an effort to secure contracts for her company from Nuru and DPW. *See Kong,* 21-CR-0354 WHO, Dkt. 40. Kong also admitted to making false statements to the FBI when confronted. *Id.* Kong was sentenced to 12 months and one day of imprisonment, three years of supervised release, and fined $95,000, below the recommended Guidelines sentence of 24-30 months. Ms. Kong did not cooperate with the government.

By way of contrast, former Recology executives John Porter and Paul Giusti were both sentenced to six months of home confinement. *United States v. John Porter*, 22-CR-00270; *United States v. Paul Giusti*, 21-CR-0294 WHO. Porter did not cooperate, while Giusti, who had greater culpability, did. *Id.* But in both the Porter and Giusti cases a, however, their bribes were made as part

U.S. SENTENCING MEMORANDUM    10
CR 20-00192 WHO

of their employment at Recology, and, unlike Bovis, Kong, Gilmartin, Varela, Hernandez and others, not for personal profit or for the profit of their personal businesses.

Finally, defendant Bovis' sentence must also reflect the fact that he has pled guilty to a separate crime, insurance fraud. Given these considerations, and weighing the Court's other sentences in similar cases, the government believes that a sentence for defendant Bovis of nine months in custody avoids unwarranted sentencing disparities with the other defendants sentenced as part of the government's San Francisco corruption prosecutions.

### c. Bovis' Offense Justifies a Significant Fine

Finally, as noted in the PSR, Bovis has significant financial assets, including a net worth of more than $5 million. *PSR* ¶ 70. As such, Bovis can afford to pay a fine. Given that his crime was driven by greed, a fine is appropriate and would serve as just punishment. Therefore, the government recommends a fine of $100,000, matching that of similarly-situated defendants Hernandez and Gilmartin. *See* Sec. b *supra*. Additionally, given defendant Bovis' significant assets, the government asks that the Court order the defendant to make payment of the fine within 60 days of imposition of judgment.

## VI. CONCLUSION

For the foregoing reasons, the government recommends that the Court grant the government's motion for a downward departure under § 5K1.1, then further vary downward from the recommended U.S.S.Gs, and sentence defendant Bovis to nine months' imprisonment to be followed by one year of Supervised Release, and a $100,000 fine.

PATRICK D. ROBBINS
Attorney for the United States

Dated: February 29, 2024
*/s/ David J. Ward*
DAVID J. WARD
Assistant United States Attorney